31187. RICH v. STATE OF GEORGIA et al.

UNDERCOFLER, Presiding Justice.

The Georgia Residential Finance Authority (Ga. L.
1974, p. 975, as amended Ga. L. 1975, p. 1651; Code Ann.
Ch. 99-36), was established by the General Assembly in
order to encourage private investment in the building and
rehabilitation of low income housing by providing
mortgage loans at low interest rates to eligible low and
moderate income borrowers. Code Ann. § 99-3602.
Pursuant to its mandate, the Authority sought to issue
revenue bonds, and the District Attorney of Fulton
County brought this bond validation proceeding. Code
Ann. § 99-3609 (o). The trial court sustained the Act's
validity, and this appeal is being prosecuted by
intervenor, Lacy B. Rich, Jr., who raises numerous
constitutional challenges to the Act. We affirm in part
and reverse in part.

A. The Valid Portions of the Act.

1. In enumeration of error five, intervenor claims
the Act is invalid because it does not serve a legitimate

public purpose. It is clear, however, that the promotion of safe, sanitary housing is a purpose cognizable by the state under the police power. See *Williamson v. Housing Authority of Augusta,* 186 Ga. 673 (199 SE 43) (1938); see, e. g.: West v. Tennessee Housing Development Agency, 512 SW2d 275 (Tenn. 1974); Minnesota Housing Finance Agency v. Hatfield, 297 Minn. 155 (210 NW2d 298) (1973); Maine State Housing Authority v. Depositors' Trust Co., 278 A2d 699 (Me. 1971); Martin v. North Carolina Housing Corp., 277 N. C. 29 (175 SE2d 665) (1970).

Further, the Act specifically provides that "the development and stimulation of trade and commerce in the housing industry of this State is vital to the public welfare, creates employment opportunities and lessens unemployment and under-employment both in the home construction and real estate industry, and that an adequate supply of money with which to finance safe and sanitary dwelling accommodations for the people of Georgia is necessary to the health of the people of the State." Code Ann. § 99-3602 (b). That this purpose is legitimate is bolstered by the Georgia Constitution itself: "The development of trade, commerce, industry and employment opportunities is hereby declared to be a public purpose vital to the welfare of the people of this State. The General Assembly may create development Authorities to promote and further such purposes. . . " Const., Art. VII, Sec. VII, Par. V (a) (Code Ann. § 2-6005.1). Thus, we find that the Act is a valid exercise of the police power by the General Assembly pursuant to a legitimate public purpose.

Intervenor interposes, however, that since the state may not constitutionally make loans, it can not set up an authority to do what it can not do. In so arguing, intervenor cites *Mulkey v. Quillian,* 213 Ga. 507 (100 SE2d 268) (1957) in which we held that the State Highway Board could not constitutionally lend money to municipalities or authorities to remove and relocate utilities located in the rights-of-way of state highways. That case, however, is distinguishable because the loan to local authorities there was to be a loan by the state of public money. Here, the funds used to carry out the

purposes of the authority are derived from the sale of the authority's revenue bonds, and is thus private, not public, money. Code Ann. § 99-3609 (a).

Similarly, there is no merit to intervenor's claim that *Tippins v. Cobb County Parking Authority,* 213 Ga. 685 (100 SE2d 893) (1951) and *Beazley v. DeKalb County,* 210 Ga. 41 (77 SE2d 740) (1953),[1] necessarily limit the types of ventures in which a state may participate. These cases involve the establishment of authorities by a political subdivision of the state (*Beazley v. DeKalb County,* supra), or by the state for a political subdivision (*Tippins v. Cobb County Parking Authority,* supra), which are limited in their undertakings under the Constitution to certain enumerated purposes. Constitution, Art. VII, Sec. VII, Par. V (Code Ann. § 2-6005). See *Daughtrey v. State,* 226 Ga. 758 (177 SE2d 670) (1970). The same limitation does not apply to the state itself. This section and these cases are thus inapposite.

In enumeration seven, intervenor contends that the Authority Act violates the provisions of the Constitution, which limit the purposes for which the state may incur debt (Const., Art. VII, Sec. III, Par. I; Code Ann. § 2-5601), and for which the state may pledge its credit (Const., Art. VII, Sec. III, Par. II; Code Ann. § 2-5602). It has long been clear, however, that an authority, being an agent of the state but not the state itself, is not restricted by the state's debt limitation in the Constitution. *McLucas v. State Bridge Bldg. Authority,* 210 Ga. 1 (77 SE2d 531) (1953). Nor does the debt of an authority or agency obligate the state or pledge the credit of the state as is required to be made explicit by the authority on the face of the bonds it issues. Code Ann. § 99-3610. *State v. Regents*

---

[1]In these cases, this court considered and found unconstitutional the "undertaking" by a county to establish a truck and freight terminal (*Beazley v. DeKalb County,* supra), and an attempt by the state legislature to authorize a Cobb County parking authority (*Tippins v. Cobb County,* supra). In the latter case, this court held the state could not do indirectly for a county what the Constitution forbids the county to do directly.

*of University System of Georgia,* 179 Ga. 210 (175 SE 567) (1934). This enumeration thus has no merit.

Additionally, intervenor claims in enumeration fifteen that since, in 1970, the voters refused to ratify a proposed constitutional amendment to set up an authority for a similar purpose, the General Assembly, as the representative of the people, can not now contravene that expression of the public and designate the promotion of housing a public purpose. This argument ignores the fact that the constitution and the electoral process are the only checks on the power of the General Assembly. Since we find no constitutional limitations on the power of the legislature to promote housing for low income families under its police power, we must again leave the people to express their will through their right to vote.

Having carefully considered all of intervenor's enumerations relating to the power of the General Assembly to enact such legislation, we hold that the promotion of housing for low and moderate income families and the stimulation of the housing market to be a valid public purpose.

2. Intervenor's first enumeration of error is a contention that the Revenue Bond Law (Code Ann. § 87-8) does not authorize the validation of the bonds the authority wishes to issue, because the authority's purpose is not an allowable "undertaking" for which bonds may be validated under the Revenue Bond Law. Code Ann. § 87-802. The Authority Act provides that "[a]ll revenue bonds issued by the authority under this Chapter shall be *executed, confirmed, and validated* under, and in accordance with, the Revenue Bond Law, . . . except as otherwise provided in this Chapter." Code Ann. § 99-3609 (l). (Emphasis supplied.) The manifest intent of the legislature was to adopt only the procedures set out in the Revenue Bond Law (Code Ann. §§ 87-814 to 87-823). In fact, that law itself makes clear that "the limitations imposed by this Chapter shall not affect the powers conferred by any other general, special, or local law." Code Ann. § 87-825. We therefore conclude that the Georgia Residential Finance Authority Act does not violate the provisions of the Revenue Bond Law in not presenting an allowable undertaking under that law.

Intervenor, in his second enumeration of error, presents the question whether the validation petition adequately complies with the provisions of the Revenue Bond Law, requiring that the petition set forth the amount of annual interest and when the bonds are to be paid in full. Code Ann. § 87-816. We have reviewed the petition and exhibits and find this enumeration to be without merit.

There was ample evidence in favor of the economic feasibility and soundness of the bonds presented to the trial court. Since the burden is on the intervenor to come forward with evidence to support any affirmative defenses interposed by him against the petition by the state setting forth the validity of the bond issue[2] (*Harrell v. Town of Whigham,* 141 Ga. 322 (80 SE 1010) (1913)), and the intervenor produced none, the trial court did not err in finding the program "sound, reasonable, feasible and practical." See *Mays v. State,* 110 Ga. App. 881 (140 SE2d 223) (1965). Furthermore, this is a legislative matter subject to the most limited review by the courts. See *Holcombe v. Georgia Milk Producers Confederation,* 188 Ga. 358 (3 SE2d 705) (1939). We thus reject intervenor's enumeration four.

The third enumeration of error proposes that since the Act provides that the bonds issued "shall be *general obligations* of the Authority," (Code Ann. § 99-3603 (b)) (emphasis supplied), the series A revenue bonds are not an authorized type of bond which the authority may issue. It is clear from the Act, however, that the authority is authorized to issue revenue bonds. Code Ann. § 99-3609. We do not find that these two sections conflict.

3. Enumerations of error eight, nine, ten and eleven challenge the composition of the membership of the authority, and, thus, the validity of any action already taken by them on behalf of the authority. The Act provides for six members: the Governor or in his stead the Director of the Office of Planning and Budget, the State

---

[2]The economic feasibility of the plan is not required to be shown by the state in its petition. Code Ann. § 87-816.

Auditor, the Director of the Financing and Investment Division, the Commissioner of Community Development, and two public members to be appointed by the Governor with the Senate's confirmation. Code Ann. § 99-3605 (a).

Enumeration of error eight raises a separation of powers question. Intervenor contends that since the state auditor is elected and paid by the legislative arm of government, the separation of powers[3] required in the constitution will be offended if he serves as a member of the authority, which is a part of the executive branch. Const., Art. I, Sec. I, Par. XXIII (Code Ann. § 2-123); *Greer v. State,* 233 Ga. 667 (212 SE2d 836) (1975).

The General Assembly has provided for a state auditor in Title 40, which deals with the Executive Department. Code Ann. Ch. 40-18. Furthermore, it is clear that the duties outlined there are executive, rather than legislative, in nature for he has no lawmaking power. That the state auditor, who will monitor the use of state money by the executive branch is elected by the General Assembly and funds for his operations are scheduled under the legislative division of the Appropriation Act does not require a different result, but is simply a reflection of the system of checks and balances among the three branches of government. "The separation of powers principle is sufficiently flexible to permit practical arrangements in a complex government, and though it is not always easy to draw a line between executive functions and legislative functions, it is quite plain to us in this case that the functions performed . . . are primarily, if not exclusively, executive." *Greer v. State,* p. 669, supra. We therefore find no merit in intervenor's contentions in this regard.

Similarly, we find no merit in intervenor's enumerations nine and ten that the provisions for the

---

[3]"The legislative, judicial and executive power shall forever remain separate and distinct, and no person discharging the duties of one, shall, at the same time, exercise the functions of either of the others, except as herein provided." Const., Art. I, Sec. I, Par. XXIII (Code Ann. § 2-123).

public members of the authority, one residing within, one outside "the Standard Metropolitan Statistical Areas of the State"; one, a representative of the homebuilding industry, the other a member of the mortgage lending industry, are invalid because these terms are vague. These descriptions are sufficiently exact to allow the Governor to make two valid appointments when necessary.

We cannot say that such qualification of the term "public members" renders it contradictory as contended by the intervenor. The word "public" in reference to these appointed members is used to distinguish them from the four "permanent" members, who are state officials.

Intervenor argues additionally that the use of the term Standard Metropolitan Statistical Area (SMSA)[4] violates the one-man, one-vote principle·in giving disproportionate representation to those outside the SMSA's where fewer Georgians live. He makes the same claim regarding the two public members to be chosen from the homebuilding and mortgage lending industries, asserting that these two businesses are thus over-represented.

It is clear from Sailors v. Board of Education of the County of Kent, 387 U. S. 105 (87 SC 1549, 18 LE2d 650) (1967), however, that the one-man, one-vote mandate of the Constitution applies only to elected officials, and is thus inappropriate where, as here, members of a clearly administrative authority are appointed.

Intervenor next contends that by adopting the SMSA to determine representation, the General Assembly has illegally delegated its legislative power to the United States Department of Commerce Office of Management and Budget, which defines SMSA's. Const., Art. III, Sec. I, Par. I (Code Ann. § 2-1301). As we made clear in *Featherstone v. Norman,* 170 Ga. 370, 394 (153 SE 58) (1930), "[w]hen a statute adopts a part or all of another statute, domestic or foreign, general or local, by specific and descriptive reference thereto, the adoption takes

---

[4]An SMSA is a metropolitan area having a population of over 50,000 persons.

the statute *as it exists at that time.* The subsequent amendment or repeal of the adopted statute or any part thereof has no effect upon the adopting statute." (Emphasis supplied.) The same is true here. In adopting SMSA as a guideline to appointing the public members of the Authority, the legislature adopted the SMSA statistical population description as it existed in 1975 when the Act was amended. Ga. L. 1975, pp. 1651, 1655 (Code Ann. § 99-3605 (a)). Thus, under the authority of *Featherstone,* supra, we do not find that such a guideline is defective in illegally delegating legislative power.

As so interpreted, we hold that the Act manifests a clear, definite statement of legislative intent, and a workable definition from which the Governor may appoint the public members of the authority.

Since we have held that the public members and the state auditor are proper members of the Georgia Residential Finance Authority, any and all actions taken by them as members of that body are valid and enforceable. Thus enumerations of error eight, nine, ten and eleven present no grounds for refusing to validate this bond issue.

4. That the rules and regulations of the authority are invalid because the Authority does not have the power to adopt them is the interventor's twelfth enumeration of error. The Act, however, provides that the "Authority shall make necessary rules and regulations for its own government," (Ga. L. 1974, pp. 975, 981; Code Ann. § 99-3605 (b)), "The Authority shall have the power . . . (4) to make and alter bylaws for its organization and internal management, . . . [and] (25) to do any and all things necessary or convenient to carry out its purposes and exercise the powers given and granted in this Chapter," (Ga. L. 1974, pp. 875, 983; Code Ann. § 99-3606 (a)). In addition, the "Authority shall establish administrative guidelines as to limitations for eligible persons and families . . . " Ga. L. 1974, pp. 975, 983, as amended by Ga. L. 1975, pp. 1651, 1659 (Code Ann. § 99-3606 (c)). The Act thus amply establishes the power of the authority to make rules and regulations.

Furthermore, we do not find that the Act is void for illegally delegating legislative power to the authority as

contended by intervenor in enumeration thirteen. "Having declared the purposes of the Act, and enacted provisions to carry the same into effect, the General Assembly could properly confer on the governing board of the authority the powers of which complaint is made." *Williamson v. Housing Authority of Augusta,* 186 Ga. 673, 681 (199 SE 43) (1938). Accord: *Southern R. Co. v. Melton,* 133 Ga. 277 (65 SE 665) (1913); *Georgia R. v. Smith,* 70 Ga. 694 (1883).

5. Intervenor's fourteenth enumeration of error asserts that the 1974 and 1975 Acts are unconstitutional for the reason that the 1974 Act refers to more than one subject matter (Ga. L. 1974, pp. 975, 987, 989; Code Ann. §§ 99-3607, 99-3608), and the 1975 Act contains matter different from that expressed in its title (Ga. L. 1975, pp. 1651, 1659-60; Code Ann. § 99-3607 (e) (9)). Const., Art. III, Sec. XVII, Par. XIII (Code Ann. § 2-1908). We find these contentions to be without merit. This court has always held that every detail of the Act need not be expressed in the caption and as long as the provisions are germane to the general purpose of the Act they will not be considered different subject matter. Since the caption of the 1974 Act specifically mentions making loans and purchasing mortgages and since both of these provisions are in furtherance of the general purposes expressed in the Act, the statute is not unconstitutional for referring to more than one subject matter. *Undercofler v. Hospital Authority of Forsyth County,* 221 Ga. 501 (145 SE2d 487) (1965); *Hope v. Mayor &c. of Gainesville,* 72 Ga. 246 (1884). Similarly, the caption of the 1975 Act includes an expressed intent "to repeal conflicting laws" which is carried out in Section 7 (e)(9) (Code Ann. § 99-3607 (e) (9)). Therefore, it can not be said that no notice of this repealer is contained in the caption of the Act, or that the Act contains matters not included in the title. *Williamson v. Housing Authority of Augusta,* supra; *Cady v. Jardine,* 185 Ga. 9 (193 SE 869) (1937).

6. Intervenor's enumeration sixteen is a contention that Section 14 of the Act, Code Ann. § 99-3614, which grants a tax exemption to all bondholders, violates the Constitution in not being the valid subject of a tax exemption. The Georgia Constitution (Art. VII, Sec. I,

Par. IV; Code Ann. § 2-5404), provides that the "General Assembly may, by law, exempt from taxation all public property; . . ." We have already decided that the Authority has been established for a valid public purpose, and we have held many times that bonds issued by the state or its institutions are public instrumentalities, and thus, properly exempted from taxation under this constitutional provision. *Sigman v. Brunswick Port Authority,* 214 Ga. 332 (104 SE2d 467) (1958); *Williamson v. Housing Authority,* supra. Similarly, there is no merit to intervenor's contention that the state has illegally granted a tax exemption to the authority.

B. The Invalid Portions and Severability.

7. Enumerations of error six, seventeen and eighteen raise the question whether the Act violates the Constitution in authorizing the General Assembly to appropriate tax funds to the authority and to the capital reserve fund whenever it is depleted below a minimum amount. Code Ann. §§ 99-3610 — 99-3612. Intervenor objects that any appropriation to the authority would be an invalid use of tax funds under the Const., Art. VII, Sec. II, Par. I (Code Ann. § 2-5501). As long as the authority has been established for a valid public purpose, the General Assembly may appropriate money for the administrative expenses of the authority. We, however, are compelled to a different result as to appropriations of tax money to be used by the authority for the payment of bondholders. We agree with intervenor that such use would be illegal as constituting a donation or gratuity contra to the Const., Art. VII, Sec. I, Par. II (Code Ann. § 2-5402).

The Act provides that "one or more *special funds to secure bonds* . . . to be known as 'capital reserve funds,' " shall be established *from "(1) any moneys appropriated and made available by the State for the purpose of such fund,"* as well as proceeds from sales of bonds and any other income and money of the authority. Code Ann. § 99-3612 (a). (Emphasis supplied.) Furthermore, subsection (c) of this same section reads, "[i]n order further to assure such maintenance of any such capital reserve fund, there may be *annually appropriated and paid to the Authority for deposit in a capital reserve fund*

such sum, if any, as shall be necessary to restore any such capital reserve fund to an amount equal to the minimum capital reserve fund requirement for such fund."[5] Code Ann. § 99-3312 (c). (Emphasis supplied.) It is also clear from this section that "[a]ll moneys held in *any capital reserve fund . . . shall be used solely for the payment of the principal of bonds of the Authority secured by such capital reserve fund as the same mature, the purchase or redemption of such bonds of the Authority, the payment of interest on such bonds of the Authority or the payment of any redemption premium required to be paid when such bonds are redeemed prior to maturity.*" Code Ann. § 99-3612 (a). (Emphasis supplied.)

At the same time, however, Section 10 of the Act manifests that "[b]onds and notes issued under the provisions of this Chapter shall not be deemed to constitute a debt of the State or a pledge of the faith or credit of the State, but such bonds and notes shall be payable solely from the funds hereinafter provided for, and the issuance of such bonds and notes shall not directly or indirectly obligate the State to levy or pledge any form of taxation whatever therefor or to make any appropriation for their payment, and all such bonds shall contain recitals on their face covering substantially the· foregoing provisions of this section: Provided, however, such *funds as may be received from State appropriations . . . may be used . . . for the payment of any obligations of the Authority. . .*" Code Ann. § 99-3610. (Emphasis supplied.)

Although these sections are permissive of the General Assembly, and thus not void because they bind future legislatures (see *State Ports Authority v. Arnall,* 201 Ga. 713 (41 SE2d 246) (1947); Maine State Housing Authority v. Depositors' Trust Co., 278 A2d 699, supra),

---

[5]This section requires the chairman of the authority to notify the Governor and others of the amounts necessary to maintain the minimum capital reserve by December 1, so that the amount can be presented to the legislature with the annual budget, which the General Assembly may then grant or refuse.

the inescapable import is that any state appropriations which are made may be used to pay the principal and interest, or to redeem or purchase the bonds and notes of the authority. Since the Act itself, on the other hand, also clearly repudiates any legal obligation of the state regarding such payments, the use of state appropriations for that purpose can only be interpreted as a donation or gratuity by the state to private bondholders. Therefore, the provisions in the Act in Sections 10 and 12[6] are unconstitutional, null and void.[7] State appropriations may not be used to pay the bondholders of the authority.

Next we must consider the severability of the invalid portions of the Act. Not only must we consider the question of severability as a result of our decision that appropriations from the state could not be used to pay note or bondholders, but also because the trial court held that the provision allowing the authority members to designate a deputy in writing to attend authority meetings in their place (Code Ann. § 99-3605 (a)) was, although an unconstitutional delegation of legislative power,[8] severable from the Act. Intervenor thus urges that the Act as a whole must fall. We do not agree.

Intervenor argues first that Section 18 of the 1974 Act, which contains the severability clause, Ga. L. 1974, pp. 975, 1001, does not also appear in the 1975 Act amending the 1974 Act, Ga. L. 1975, p. 1651. He maintains the severability clause thus cannot affect the unconstitutional portions of the Act relating to deputizing members of the authority since this section appears in the 1975 Act. Ga. L. 1975, pp. 1651, 1655 (Code Ann. § 99-3605 (a)). Obviously, the Georgia Residential Finance

---

[6]The same constitutional deficiency would apply to any use of state appropriations to pay note or bondholders under Section 13 from the general reserve fund. Code Ann. § 99-3613.

[7]We, therefore, do not reach intervenor's enumeration seventeen that the state, by enacting such legislation has also morally obligated itself to meet obligations on the bonds which the authority cannot pay.

[8]This ruling was not appealed by the authority.

Authority Act is the 1974 Act as amended by the 1975 Act, and it, therefore, contains an effective severability clause. There is no merit to intervenor's contention.

The general law on severability was perhaps most aptly expressed in *Bennett v. Wheatley,* 154 Ga. 591, 595 (115 SE 83) (1922): "It is now the well-settled principle of constitutional construction in this State, that, unless the main purpose of the statute, or one of its provisions, is affected by the unconstitutionality of a particular part, the whole act or provision is not thereby defeated. If the statute is in part constitutional and valid, and in part unconstitutional and invalid, and the objectionable portion is so connected with the general scheme that, should it be stricken out, effect cannot be given to the legislative intent, the whole statute, section, or portion must fall; but where an act cannot be sustained as a whole, the courts will uphold it in part, when it is reasonably certain that to do so would correspond with the main intent and purpose which the legislature sought to accomplish by its enactment, if, after the unconstitutional part is stricken, there remains enough to accomplish that purpose." It is this rule which we must apply. This court, furthermore, in considering severability, has always given great weight to legislative expression to this effect in the pertinent statutes. See, e. g., *Greer v. State,* supra; *Fortson v. Weeks,* 232 Ga. 472 (202 SE2d 68) (1974). This Act, as stated above, contains such a "savings clause." Ga. L. 1974, pp. 975, 1001.

We do not find that removing either the section held invalid by the trial court allowing the authority members to appoint deputies, or the sections we found unconstitutional would undermine the general intent and overall scheme of this Act. We therefore hold that these portions may be severed from the Act and that the Georgia Residential Finance Act as a whole is not void.

The bonds sought to be issued are a valid and proper exercise of the Georgia Residential Finance Authority's mandate from the General Assembly in pursuance of its established purposes, with the exceptions of the severable portions noted in Division 7 above.

*Judgment affirmed in part, reversed in part. All the Justices concur, except Gunter, J., who concurs specially.*

304

*Bryan, Ramos & Arnold, Gary P. Arnold, Merle A. Ramos,* for appellant.

*Lewis R. Slaton, District Attorney, Lauren O. Buckland, Assistant District Attorney, Arthur K. Bolton, Attorney General, Troutman, Sanders, Lockerman & Ashmore, Mark S. Kaufman,* for appellees.

GUNTER, Justice, concurring specially.

I concur in the judgment of the court, but I disagree with the majority in that I think that the State Auditor is a member of the legislative department of the state government; and his service as a member of the Authority offends the separation of powers principle.

The legislative branch of the government elects the State Auditor. As I read Code Ann. § 40-1801, the State Auditor is elected by the legislative branch for an indefinite term, and the election by the legislative branch of another individual to be State Auditor effectively discharges the State Auditor then serving. I find no statutory authority for the Governor to discharge a State Auditor, and the Governor merely has power to appoint an interim State Auditor in case of a vacancy in that office pending the election by the General Assembly of a State Auditor at its next regular session. Code Ann. § 40-1801.

Furthermore, the Appropriations Committee of the House and the Appropriations Committee of the Senate "have the right and authority to direct and require the State Auditor to make a special examination into and audit [sic] all of the books, records, accounts, vouchers, warrants, bills and other papers and records, and the financial transaction and management of any department, institution, agency, commission, bureau or office of the State at any time." Code Ann. § 40-1806.

Because I read these statutory provisions to mean the General Assembly can employ and discharge a State Auditor, and because I read these provisions to mean that the Appropriation Committees of the House and Senate

have equal power with the Governor in directing the activities of the State Auditor with respect to special examinations and audits of any office of the State, I conclude that the State Auditor is a member of the legislative department rather than a member of the executive department of the government.